IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EDWARD MICHAEL NERO, et al.          *

       Plaintiffs          *

       vs.          * CIVIL ACTION NO. MJG-16-1288

MARILYN MOSBY, et al.          *

       Defendants          *

\*          \*          \*          \*          \*          \*          \*          \*          \*

BRIAN SCOTT RICE          *

       Plaintiffs          *

       vs.          * CIVIL ACTION NO. MJG-16-1304

MARILYN MOSBY, et al.          *

       Defendants          *

\*          \*          \*          \*          \*          \*          \*          \*          \*

ALICIA WHITE, et al.          *

       Plaintiffs          *

       vs.          * CIVIL ACTION NO. MJG-16-2663

MARILYN MOSBY, et al.          *

       Defendants          *

\*          \*          \*          \*          \*          \*          \*          \*          \*

## MEMORANDUM AND ORDER RE: DISMISSAL MOTIONS

The Court has before it the following motions to dismiss[1]

---

[1]    Each motion was filed seeking dismissal or, in the alternative, summary judgment.  By the Procedural Order issued

with the materials submitted relating thereto:

   <u>In MJG-16-1288</u>:

   - Defendant Samuel Cogen's Motion To Dismiss [ECF No. 12].

   - Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 25].

   <u>In MJG-16-1304</u>:

   - Defendant Samuel Cogen's Motion To Dismiss [ECF No. 8].

   - Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 24].

   <u>In MJG-16-2663</u>:

   - Defendant Samuel Cogen's Motion To Dismiss [ECF No. 11].

   - Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 22].

   The Court has held a hearing and has had the benefit of the arguments of counsel.

I.   <u>SUMMARY INTRODUCTION</u>[2]

   At about 9:15 in the morning of April 12, 2015 ("April 12"), Baltimore City Police Officers detained Freddie Carlos Gray, Jr. ("Gray"), a 25-year-old black man, and found on him a

---

August 26, 2016, in each case, the Court denied all summary judgment motions without prejudice as premature.
[2]   This summary presents, as a background introduction, what the Court presently understands to be undisputed or not reasonably disputable.  See Appendix A for a summary of the by no means undisputed "facts" as alleged by Plaintiffs.

knife that had a spring or other device for opening or closing
the blade (the "Knife").  Considering possession of the Knife to
be a crime,[3] the police arrested Gray, obtained a police vehicle
to transport him to the police station, and placed Gray in the
vehicle.

After making four stops along the way, the police vehicle
arrived at the station and Gray was observed to be in need of
medical care.  A medical unit was called and took Gray to the
University of Maryland Shock Trauma Unit where he underwent
surgery.  A week later, on April 19,[4] Gray died from a spinal
cord injury sustained in the course of the events of the morning
of April 12.

On April 21, six of the Baltimore City Police Officers who
had interacted with Gray on April 12 (collectively referred to
as "the Six Officers") were suspended with pay.   They were the
driver of the vehicle, Caesar Goodson ("Goodson), Edward Nero
("Nero"), Garrett Miller ("Miller"), Brian Rice ("Rice"), Alicia
White ("White"), and William Porter ("Porter").

On April 27, Gray's funeral was held.  After the funeral
there was substantial unrest in Baltimore City including riots,

---

[3]   Baltimore City Code § 59-22 states, "It shall be unlawful
for any person to sell, carry, or possess any knife with an
automatic spring or other device for opening and/or closing the
blade, commonly known as a switch-blade knife."
[4]   All date references herein are to 2015 unless indicated as in
2016.

declaration of a state of emergency, deployment of the National Guard, and a curfew.

On May 1, an Application for Statement of Charges ("the Application")[5] against the Six Officers was filed in the District Court of Maryland for Baltimore City.  Based thereon, a state court commissioner issued warrants, and the Six Officers were arrested.

On May 1, State's Attorney Marilyn Mosby ("Mosby") held a press conference, announced that she had filed charges against the Six Officers, and read from the Statement of Charges.  In addition, Mosby stated that her staff had conducted an investigation independently from the Police Department that resulted in the charges against the Six Officers,[6] that the

---

[5]     Signed by Major Samuel Cogen of the Baltimore City Sheriff's Office.

[6]         Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension. Over the course of our independent investigation, in the untimely death of Mr. Gray, my team worked around the clock; 12 and 14 hour days to canvas and interview dozens of witnesses; view numerous hours of video footage; repeatedly reviewed and listened to hours of police video tape statements; surveyed the route; reviewed voluminous medical records; and we leveraged the information made available to us by the police department, the community, and the family of Mr. Gray.

* * *

4

accusations against the Six Officers were not an indictment of the entire police force,[7] and that the actions of the Six Officers would not harm the working relationship between police and prosecutors.[8]

Mosby further called upon the public, including those who,

---

> Lastly, I'd like to thank my team for working around the clock since the day that we learned of this tragic incident. We have conducted a thorough and independent investigation of this case.

Time Staff, *Read the Transcript of Marilyn J. Mosby's Statement on Freddie Gray*, TIME (May 1, 2015), http://time.com/3843870/marilyn-mosby-transcript-freddie-gray/ [hereinafter referred to as "Transcript"] [ECF No. 23-1 in 16-1304].

> We independently verified those facts and everything we received from the police department, so it's a culmination of the independent investigation that we conducted as well as the information we received from the police department.
>
> *      *      *
>
> I can tell you that from day one, we independently investigated, we're not just relying solely upon what we were given by the police department, period.

¶ 81 [ECF No. 31 in 16-2663].
[7]    "To the rank and file officers of the Baltimore Police Department, please know that these accusations of these six officers are not an indictment on the entire force." Transcript at 5 [ECF No. 23-1 in 16-1304].
[8]    "I can tell you that the actions of these officers will not and should not, in any way, damage the important working relationships between police and prosecutors as we continue to fight together to reduce crime in Baltimore." Transcript at 5 [ECF No. 23-1 in 16-1304].

themselves, "had experience[d] injustice at the hands of police officers" to be peaceful as the Six Officers were prosecuted.[9] Mosby also said:

> Last, but certainly not least, to the youth of the city. I will seek justice on your behalf. This is a moment. This is your moment. Let's insure we have peaceful and productive rallies that will develop structural and systemic changes for generations to come.

Transcript at 5 [ECF No. 23-1 in 16-1304].

On May 21, a Baltimore City grand jury indicted the Six Officers, charging:

- Goodson with second degree depraved heart murder, involuntary manslaughter, second-degree negligent assault, manslaughter by vehicle by means of gross negligence, manslaughter by vehicle by means of criminal negligence, misconduct in office by failure to secure prisoner, and failure to render aid.

- Rice with involuntary manslaughter, assault in the second degree, assault in the second degree [sic], misconduct in office, and false imprisonment.

- Miller with intentional assault in the second-degree, assault in the second-degree negligent, misconduct in office, and false imprisonment.

- Nero with assault in the second degree intentional, assault in the second degree negligent, misconduct in office, and false imprisonment.

---

[9] "To the people of Baltimore and the demonstrators across America: I heard your call for 'No justice, no peace.' Your peace is sincerely needed as I work to deliver justice on behalf of this young man. To those that are angry, hurt or have their own experiences of injustice at the hands of police officers I urge you to channel that energy peacefully as we prosecute this case." Transcript at 4 [ECF No. 23-1 in 16-1304].

- White with manslaughter, involuntary manslaughter, second-degree assault, and misconduct in office.

- Porter with involuntary manslaughter, assault in the second degree, and misconduct in office.

Transcript at 4 [ECF No. 23-1 in 16-1304].

None of the Six Officers was convicted of any crime.  Three proceeded to trial.  First, Porter was tried by a judge and jury that failed to agree upon a unanimous verdict.  Second, Nero and Rice were tried separately by Judge Williams of the Circuit Court of Baltimore City without a jury, and both Officers were acquitted.  On July 27, 2016, Mosby dismissed all charges against Goodson, Miller, Porter, and White.

Five of the Six Officers[10] (collectively referred to as "Plaintiffs") have filed the instant lawsuits against Mosby and Cogen:[11]

- Nero and Miller, (MJG-16-1288)[12]
- Rice, (MJG-16-1304)[13]
- White and Porter (MJG-16-2663).[14]

By the instant motions, Mosby and Cogen seek dismissal of

---

[10]   I.e., all but Goodson.

[11]   Cogen, while not admitting any wrongdoing on the part of Mosby, contends that the Application for Statement of Charges that he signed was based on the investigation conducted by the State's Attorney's Office and the Baltimore City Police.  Hence, he alleges, he cannot be held liable on any of Plaintiffs' claims.

[12]   Filed on April 29, 2016, in this Court.

[13]   Filed on May 2, 2016, in this Court.

[14]   Filed on May 2, 2016, in the Circuit Court of Maryland for Baltimore City and, on July 26, 2016, removed to this Court.

all claims against them pursuant to Federal Rule of Civil

Procedure 12(b)(6).


II.   DISMISSAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil

Procedure 12(b)(6)[15] tests the legal sufficiency of a complaint.

A complaint need only contain "a short and plain statement of

the claim showing that the pleader is entitled to relief, in

order to give the defendant fair notice of what the . . . claim

is and the grounds upon which it rests." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  When

evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-

pleaded allegations are accepted as true and the complaint is

viewed in the light most favorable to the plaintiff.  However,

conclusory statements or a "formulaic recitation of the elements

of a cause of action" will not suffice.  Id.  A complaint must

allege sufficient facts to "cross 'the line between possibility

and plausibility of entitlement to relief.'"  Francis v.

Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly,

550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim

is "a context-specific task that requires the reviewing court to

---

[15]   All "Rule" references herein are to the Federal Rules of
Civil Procedure.

draw on its judicial experience and common sense." Id. Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

Generally, a motion to dismiss filed under Rule 12(b)(6) cannot reach the merits of an affirmative defense. Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007). However, affirmative defenses are appropriate to consider at the Rule 12(b)(6) stage "when the face of the complaint clearly reveals[16] the existence of a meritorious affirmative defense." Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013)(emphasis added)(quoting Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011)).

III. DISCUSSION

While the three Complaints are not absolutely identical, there is essentially commonality of the factual allegations and claims. Moreover, the Court will, if necessary, grant

---

[16]    In the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint. Richmond, Fredericksburg & Potomac R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993).

Plaintiffs leave to file amended complaints consistent with the instant decision.  Therefore, the claims and defenses presented in all three cases shall be discussed collectively.

Plaintiffs assert the following claims:

1. <u>Common Law Claims</u>

   a. False Arrest & False Imprisonment[17]

   b. Malicious Prosecution[18]

   c. Abuse of Process[19]

   d. Defamation & Invasion of Privacy[20]

   e. Conspiracy[21]

2. <u>Constitutional Claims</u>

   a. 42 U.S.C. § 1983 – Violation of the Fourth and Fourteenth Amendments[22]

   b. Violation of Maryland Declaration of Rights, Articles 24 and 26[23]

3. <u>Claims Against the State of Maryland</u>[24]

---

[17]    Counts VI and VIII in 16-2663. Counts I-II in 16-1304. Counts I-IV in 16-1288.
[18]    Count XI in 16-2663.
[19]    Count XII in 16-2663.
[20]    Counts II and IV in 16-2663. Count V (defamation) in 16-1304. Counts IX and X (defamation) in 16-1288.
[21]    Count XIII in 16-2663.
[22]    Count X in 16-2663. Count IV in 16-1304.  Counts VII and VIII in 16-1288.
[23]    Count IX in 16-2663.  Count III in 16-1304.  Counts V and VI in 16-1288.
[24]    All claims asserted against individual Defendants except malicious prosecution, abuse of process, and conspiracy.

Defendants assert immunity from suit on certain of Plaintiffs' claims.  Mosby claims absolute prosecutorial immunity from suit.  Mosby and Cogen both claim public official immunity, statutory immunity, and qualified immunity.

The Court shall address Plaintiffs' claims and Defendants' immunity assertions in turn.


A. <u>Common Law Claims</u>

   1. <u>False Arrest & False Imprisonment</u>

The Court stated in the October 11, 2016 Order issued in each case:

> Absent a showing to the contrary, I shall dismiss the claims for false imprisonment and false arrest but consider claims for malicious prosecution.

[ECF No. 44 in 16-1304].

There has been no showing to the contrary.

In Maryland, when an individual is arrested pursuant to an arrest warrant, no claim for false arrest or false imprisonment lies against "either the instigator or the arresting officer where the plaintiff is not detained by the instigator." <u>Montgomery Ward v. Wilson</u>, 664 A.2d 916, 927 (Md. 1995). "Rather, to the extent that the instigator acts maliciously to secure the warrant for the plaintiff's arrest, the plaintiff's cause of action against the instigator is malicious

prosecution." <u>Id.</u>

All claims of false arrest and false imprisonment are dismissed.


### 2. <u>Malicious Prosecution</u>

To establish a malicious prosecution claim,[25] a plaintiff must prove that:

1. A criminal proceeding was brought against plaintiff,

2. The case terminated in the plaintiff's favor,

3. The absence of probable cause, and

4. Malice, meaning "a primary purpose in instituting the proceeding other than that of bringing an offender to justice."

<u>Exxon Corp. v. Kelly</u>, 381 A.2d 1146, 1149 (Md. 1978) (quoting <u>Safeway Stores, Inc. v. Barrack</u>, 122 A.2d 457, 460 (Md. 1956)).

There is no doubt that each Plaintiff was the subject of criminal proceedings that terminated in his/her favor.

As discussed in Appendix B, accepting as true Plaintiffs'

---

[25]   A disfavored, but potentially valid, claim.  <u>See</u> <u>Exxon Corp. v. Kelly</u>, 381 A.2d 1146, 1149 (Md. 1978) (citing <u>Siegman v. Equitable Trust Co.</u>, 297 A.2d 758, 762 (Md. 1972))("While the tort is not a favorite of the law, the cause of action remains a viable one in this State.").

factual allegations, they have pleaded[26] plausible claims that

there was no probable cause to arrest and prosecute them.

There is no plausible claim that either Defendant had

actual personal malice toward any Plaintiff. However,

> [a]s a substantive element of the tort of
> malicious prosecution, malice means that the
> defendant "was actuated by an improper
> motive," a purpose "other than that of
> bringing [the plaintiff] to justice." That
> kind of malice, though a separate element of
> the tort, may be inferred from the lack of
> probable cause.

DiPino v. Davis, 729 A.2d 354, 374 (Md. 1999) (quoting

Montgomery Ward, 664 A.2d at 925).

Accordingly, Plaintiffs' malicious prosecution claims are

not dismissed.[27]


### 3.   Abuse of Process

To establish an abuse of process claim, a plaintiff must

prove an ulterior motive, and "a willful act in the use of

process not proper in the regular conduct of the proceeding."

Palmer Ford, Inc. v. Wood, 471 A.2d 297, 310-11 (Md.

1984)(quoting W. Prosser, Handbook of the Law of Torts 857 (4th

---

[26]   Allegations are not evidence.  The Court is not deciding
whether Plaintiffs can present evidence adequate to avoid
summary judgment.

[27]   As discussed below, Mosby asserts absolute prosecutorial
immunity for her actions as a prosecutor. Plaintiffs' malicious
prosecution claims relate to her actions when functioning as an
investigator and not as a prosecutor.

ed. 1971)).

As discussed in Appendix B, Plaintiffs have alleged facts adequate to establish a plausible claim of an ulterior motive on the part of the Defendants.

However, to establish an abuse of process there must be a willful act that takes place _after_ the process has issued.  That is, "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." Id. (emphasis added).

"[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." Id.; see also Berman v. Karvounis, 518 A.2d 726, 729 (Md. 1987) ("Appellants have failed to allege in what manner process was used in some abnormal fashion 'to coerce/extort money and/or property from' them.").

Plaintiffs do not allege that the process was used for other than its regular purpose, i.e., to arrest persons charged with crimes.  Thus, Plaintiffs have not alleged facts adequate to present a plausible claim that the Defendants wrongfully misused the arrest warrant after it was issued by the Commissioner.

Accordingly, all abuse of process claims shall be dismissed.

14

### 4.  Press Conference - Defamation and False Light

Plaintiffs assert claims against Mosby for statements she made[28] during her May 1, 2015, press conference.  Plaintiffs claim that Mosby committed the torts of defamation and invasion of privacy (false light).[29]

As discussed herein, Plaintiffs' press conference-based claims for defamation and invasion of privacy (false light) are not dismissed.

### a. Defamation

To establish a defamation claim, a plaintiff must prove (1) that the defendant made a defamatory statement to a third person, (2) falsity, (3) legal fault, and (4) harm.  Rosenberg v. Helinski, 616 A.2d 866, 876 (Md. 1992).  Moreover, when a plaintiff is, as are these Plaintiffs, a public official, a higher degree of legal fault (actual malice) must be proven.

Plaintiffs have adequately alleged that, in the press conference, Mosby made statements to third parties, i.e., the

---

[28]    There are no factual allegations supporting a plausible defamation or invasion of privacy (false light) against Cogen for any public statement made by him.

[29]    Because "[a]n allegation of false light must meet the same legal standards as an allegation of defamation," courts often analyze the torts concurrently. Piscatelli v. Van Smith, 35 A.3d 1140, 1146-47 (Md. 2012); see also Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 315 n.8 (Md. App. 1995).

public.  Some of Mosby's statements at the press conference are

at least plausibly, if not obviously, defamatory.[30]

For example, Mosby read from the Application, the statement

that

> [t]he knife [found on Gray] was not a
> switchblade and is lawful under Maryland
> law. . . .  Lt. Rice, Officer Miller and
> Officer Nero failed to establish probable
> cause for Mr. Gray's arrest as no crime had
> been committed by Mr. Gray.

Transcript at 2 [ECF No. 23-1 in 16-1304].

Mosby also read from the Application, statements that:

- Gray exhibited an "obvious and recognized need for
  medical assistance." Id. at 3.

- White and Porter observed "Mr. Gray unresponsive on
  the floor of the wagon." Id.

- "When [Gray] did not respond, [Officer White] did
  nothing further despite the fact that she was advised
  that he needed a medic." Id.

- Officer White "made no effort to look, assess or
  determine [Gray's] condition." Id.

In addition to reading from the Application, Mosby made

statements that are plausibly, in context, defamatory.  For

example:

> To those that are angry, hurt or have

---

[30]  A statement is defamatory if it "tends to expose a person
to public scorn, hatred, contempt or ridicule, thereby
discouraging others in the community from having a good opinion
of, or associating with, that person." Rosenberg v. Helinski,
616 A.2d 866, 871 (Md. 1992); see also Ross v. Cecil Cty. Dep't
of Soc. Servs., 878 F. Supp. 2d 606, 624 (D. Md. 2012).

> their own experiences of injustice at the
> hands of police officers I urge you to
> channel that energy peacefully as we
> prosecute this case. . . .
>
> To the rank and file officers of the
> Baltimore Police Department, please know
> that these accusations of these six officers
> are not an indictment on the entire force.
>
> . . . I can tell you that the actions of
> these officers will not and should not, in
> any way, damage the important working
> relationships between police and prosecutors
> as we continue to fight together to reduce
> crime in Baltimore.

Transcript at 4-5 [ECF No. 23-1 in 16-1304].

Plaintiffs, as police officers, are considered public officials who are subject to an augmented burden when asserting a defamation claim.  "[A] public official [cannot] recover[] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  "[P]olice officers, from patrol officers to chiefs, are regarded for New York Times purposes as public officials." Smith v. Danielczyk, 928 A.2d 795, 805 (Md. 2007).

To establish actual malice for defamation purposes, a plaintiff must prove by clear and convincing evidence that a defamatory statement was a "calculated falsehood or lie 'knowingly and deliberately published.'" Capital-Gazette

<u>Newspapers, Inc. v. Stack</u>, 445 A.2d 1038, 1044 (Md. 1982)

(quoting <u>Garrison v. State of La.</u>, 379 U.S. 64, 75, (1964)).  It

is not sufficient merely to prove that the statement was

erroneous, derogatory or untrue, that the speaker acted out of

ill will, hatred or a desire to injure the official, acted

negligently, or acted without undertaking a reasonable

investigation.  <u>Id.</u>

However, malice can be proven by circumstantial

evidence because a plaintiff will "rarely be successful in

proving awareness of falsehood from the mouth of the defendant

himself." <u>Batson v. Shiflett</u>, 602 A.2d 1191, 1214 (Md. 1992)

(quoting <u>Herbert v. Lando</u>, 441 U.S. 153, 170 (1979)).

> Absent such an admission, a public figure's
> proof must rely solely upon circumstantial
> evidence, which, by it, can establish actual
> malice and override a defendant's claim of
> good faith and honest belief that his
> statements were true.

<u>Id.</u> (internal citations omitted).

Plaintiffs allege facts adequate to present a plausible

claim that at least some of Mosby's defamatory press conference

statements were made with knowledge that they were false or made

with reckless disregard of whether they were false or not, that

is with the requisite malice for defamation purposes. <u>See</u>

Appendix B.

b.   <u>Invasion of Privacy (False Light)</u>

In regard to the tort of invasion of privacy (false light),

Maryland follows the <u>Restatement (Second) of Torts</u>' definition

of "false light," which states:

> One who gives publicity to a matter
> concerning another that places the other
> before the public in a false light is
> subject to liability to the other for
> invasion of privacy, if (a) the false light
> in which the other person was placed would
> be highly offensive to a reasonable person,
> and (b) the actor had knowledge of or acted
> in reckless disregard as to the falsity of
> the publicized matter and the false light in
> which the other would be placed.

<u>Bagwell</u>, 665 A.2d at 318 (citing Restatement (Second) of Torts §

652E (1977)).  The tort does not require "making public any

facts concerning the private life of the individual."

Restatement (Second) of Torts § 652E cmt. a; <u>see also</u> <u>Klipa v.</u>

<u>Bd. of Educ. of Anne Arundel Cty.</u>, 460 A.2d 601, 607-08 (Md.

App. 1983).

There is no doubt that Mosby gave publicity to the

statements made in her press conference.

Plaintiffs present a plausible claim that Mosby, in her

press conference statements, placed them in a false light that

would be highly offensive to a reasonable person.  For example,

she made the statements referenced in the foregoing discussion

regarding the defamation claim.

Plaintiffs have presented factual allegations adequate to present a plausible claim that Mosby knew of the falsity of her statements, or acted with reckless disregard of the truth and the false light, in which Plaintiffs would be placed.  See discussion in Appendix B.

### c. Mosby's Affirmative Defenses

Mosby presently seeks dismissal of Plaintiffs' claims based upon her press conference statements by virtue of

> 1. The alleged running of limitations, and
>
> 2. Conditional privileges.

### (i) Limitations

Mosby held her press conference on May 1, 2015. Plaintiffs' defamation and invasion of privacy claims are subject to a one-year limitations period.[31]  The Complaint in MJG-16-1288 was filed on April 29, 2016, within a year of the press conference.  The Complaints in MJG-16-1304 and MJG-2663 were filed on May 2, 2016, a year and a day after the press conference.  However, May 1, 2016, was a Sunday.  Therefore, the limitations period was extended to the next business day.  Md. Rule 1-203(a)(2) (2016 Repl. Vol.).

Mosby does not present a valid limitations defense.

---

[31]    Md. Code Ann., Cts. & Jud. Proc. § 5-105 (2013 Repl. Vol.).

(ii) <u>Conditional Privileges</u>

Mosby claims that her statements at the press conference were protected by conditional privileges.

"Conditional privileges 'rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest.'" <u>Woodruff v. Trepel</u>, 725 A.2d 612, 622 (Md. 1999)(quoting <u>Marchesi v. Franchino</u>, 387 A.2d 1129, 1131 (Md. 1978)).  A conditional privilege, unlike an absolute one, can be lost if it is abused or if the defendant acted with malice.  <u>See</u> <u>Piscatelli</u>, 35 A.3d at 1148.  The same conditional privileges apply to both defamation and invasion of privacy (false light). <u>See</u> Restatement (Second) Torts § 652G cmt. a ("Under any circumstances that would give rise to a conditional privilege for the publication of defamation, there is likewise a conditional privilege for the invasion of privacy."); <u>Steer v. Lexleon, Inc.</u>, 472 A.2d 1021, 1023-24 (Md. App. 1984) (applying privilege to defamation and false light claims).

There are two conditional privileges that could apply to Mosby's statements:

- The fair reporting privilege[32] and its self-reporting exception in regard to the statements Mosby read from the Application, and

- The fair comment privilege pertinent to Mosby's other statements.

### (a)  Fair Reporting Privilege

The fair reporting privilege protects reports and re-statements of legal and official proceedings, which themselves are protected by absolute privilege. Woodruff, 725 A.2d at 617 ("It is well-settled in Maryland that statements uttered in the course of a trial or contained in pleadings, affidavits, or other documents related to a case fall within an absolute privilege . . ."). The fair reporting privilege applies "even if the story contains defamatory material, as long as the account is fair and substantially accurate," Chesapeake Pub. Corp. v. Williams, 661 A.2d 1169, 1174 (Md. 1995), meaning the report must be "substantially correct, impartial, coherent, and bona fide." Piscatelli, 35 A.3d at 1149.

According to the Restatement (Second) of Torts, "[a]n arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer

---

[32]    Although Mosby did not raise the fair reporting privilege in her responses, Plaintiffs addressed the fair reporting privilege in their briefs, and the Court finds it appropriate to address it.

in making or returning the arrest is therefore within the [fair reporting] privilege covered by this Section." § 611 cmt. h. Analogously, Mosby's verbatim reading from the Application of the Statement of Charges at the press conference could be within the fair reporting privilege because the underlying document is related to the charge of crime and a court proceeding.

In the absence of an exception, Mosby would have a fair reporting privilege in regard to her reading verbatim the Application submitted to the District Court Commissioner. However, Plaintiffs present a plausible claim that Mosby's statements fall within an exception to that privilege.

The Restatement (Second) of Torts commentary acknowledges an exception to privilege, which the Maryland Court of Appeals has labeled the "self-reported statement exception." See Rosenberg, 616 A.2d at 876.  The Restatement explains, "[a] person cannot confer this [fair reporting] privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated.  This is true whether the original publication was privileged or not." Restatement (Second) of Torts § 611 cmt. c (1977). In its interpretation of this exception, the Rosenberg Court held that

> . . . the privilege will be forfeited only
> if the defamer illegitimately fabricated or
> orchestrated events so as to appear in a
> privileged forum in the first place.
> * * *

> It is clear that the exception made for
> self-reported statements aims to deter those
> persons who, acting out of a corrupt
> defamatory motive, abuse the privilege
> accorded to fair and accurate reports of
> judicial proceedings.

616 A.2d at 876-77.  An example of this would be provided by a

case in which a person filed a court pleading containing

defamatory statements so as to be able to claim a privilege when

he/she publicized the defamatory statements and injured

another's reputation.

Plaintiffs have alleged facts adequate to present a

plausible claim that Mosby was instrumental in the investigation

on which the Application was based and participated in writing

the Application - even though Cogen signed it and submitted it

to the Commissioner.  They have plausibly alleged that Mosby, in

her press conference, read false statements in the Application

that she had created and knew were false for such purposes as

"appeasing the public and quelling the riots," ¶ 135 [ECF No. 31

in 16-2663], getting the benefit of national attention and media

coverage, id. at ¶ 74, and promoting her political agenda, id.

at ¶¶ 236-37.

Plaintiffs' allegations are sufficient to present a

plausible claim that the self-reporting exception could be

applicable to Mosby's fair reporting privilege.

Mosby is not entitled to dismissal of Plaintiff's press conference-based claims by virtue of the fair reporting privilege.

### (b) Fair Comment Privilege

The fair comment privilege covers expressions of "fair and reasonable opinion[s] or comment[s] on matters of legitimate public interest." Piscatelli, 35 A.3d at 1152. Reports on prosecutions of crimes are matters of public interest. See id. (noting that it is an "obvious" principle that prosecutions of crimes, especially murder, are of public interest). However, to be covered by the privilege, the comments must be "pure opinions," not "mixed opinions." Id. at 1153. This means that privileged opinions must be based on non-defamatory, true, readily accessible, or privileged facts – not false, unprivileged, or undisclosed facts. Id.

Plaintiffs have made factual allegations adequate to present a plausible claim that Mosby's statements were a "mixed opinion" not protected by the fair comment privilege. These include the allegations that Mosby's opinion and comments were based on false statements Mosby read from the Application, that Mosby caused the false statements to be in the Application to be able to publicize them, and that the comments were, at least in part, based on non-disclosed, non-public facts from her

25

independent investigation.[33]

Mosby is not entitled to dismissal of Plaintiffs' press conference based claims by virtue of the fair comment privilege.

### 5. Conspiracy

Plaintiffs assert claims labelled "civil conspiracy" as if there could be a recovery from a Defendant as a conspirator in the absence of an underlying tort.  However, in Maryland, civil conspiracy is not recognized as an independent tort.  See Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc., 665 A.2d 1038, 1045 (Md. 1995).  The Court of Appeals has "consistently held that 'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." Id. (quoting Alexander v. Evander, 650 A.2d 260, 265 n.8 (Md. 1994)).

As stated by the Maryland Court of Appeals more than a century ago:

> There is no doubt of the right of a plaintiff to maintain an action on the case against several, for conspiring to do, and actually doing, some unlawful act to his damage.  But it is equally well-established, that no such action can be maintained unless the plaintiff can show that he has in fact

---

[33]   Mosby stated at the press conference, "the evidence we have collected and continued to collect cannot ethically be released to the public and I strongly condemn anyone in law enforcement with access to trial evidence who has leaked information prior [to] resolution of this case." Transcript at 4.

> been aggrieved, or has sustained actual
> legal damage by some overt act, done in
> pursuance and execution of the conspiracy.
> It is not, therefore, for simply conspiring
> to do the unlawful act that the action lays.
> It is for doing the act itself, and the
> resulting actual damage to the plaintiff,
> that afford the ground of the action.

Kimball v. Harman & Burch, 34 Md. 407, 409 (Md. 1871).

While there is no separate tort claim for conspiracy, Plaintiffs may utilize a civil conspiracy theory to hold a defendant liable for torts committed by his/her co-conspirators within the scope of the conspiracy.  Hence, Plaintiffs may assert a conspiracy theory to hold a Defendant liable on a substantive claim, but not as a free-standing claim.

Accordingly, all conspiracy claims are dismissed.[34]


B.  Constitutional Claims

Plaintiffs assert claims under the Fourth and Fourteenth Amendments to the United States Constitution and essentially duplicative claims under the Maryland Declaration of Rights Articles 24[35] and 26[36].

---

[34]    Plaintiffs are not precluded from asserting – should there be adequate evidence to support the assertion - that a Defendant should be held liable on a remaining claim as a co-conspirator.
[35]    "[N]o man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges. . . or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Decl. of Rts. art. XXIV.

Procedurally, Plaintiffs procedurally filed their constitutional claims pursuant to 42 U.S.C. § 1983 that provides in pertinent part:

> Every person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

42 U.S.C. § 1983 (2012).

To establish a § 1983 claim, a plaintiff must prove that a defendant:

1. Acted under color of state law,

2. Deprived him/her of a right secured by the Constitution, and

3. Is not entitled to qualified immunity.[37]

### 1.   Color of State Law

There is no doubt that all pertinent actions of Defendants were performed under color of state law, i.e., as state officials.

---

[36]   "[A]ll warrants, without oath or affirmation, . . . to seize any person or property, are grievous and oppressive." Md. Const. Decl. of Rts. art. XXVI.
[37]   That is, the right must have been clearly established at the time of events at issue. See Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016). See discussion of qualified immunity below.

## 2. Deprivation of Rights

The Fourth Amendment to the United States Constitution provides, in pertinent part:

> The right of the people to be secure in
> their persons, . . . against unreasonable .
> . . seizures, shall not be violated.

U.S. Const. amend. IV.

The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

> No State shall . . . deprive any person of
> life, liberty, or property, without due
> process of law.

U.S. Const. amend. XIV, § 1.

The essence of Plaintiffs' § 1983 claims is that Defendants committed wrongful actions that caused them to be arrested and charged without probable cause, i.e., they effectively present a malicious prosecution claim or wrongful seizure claim under § 1983.  "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).

As discussed in Appendix B, Plaintiffs have alleged facts adequate to present plausible claims that Defendants caused their arrest without probable cause. And, all criminal

proceedings ended in Plaintiffs' favor.  Therefore, Plaintiffs' allegations suffice to state a plausible claim that their Fourth Amendment rights were violated by Defendants.

A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment [not a Fourteenth Amendment][38] claim for unreasonable seizure which incorporates certain elements of the common law tort." <u>Lambert v. Williams</u>, 223 F.3d 257, 261 (4th Cir. 2000)(citing other circuits).  Therefore, as was done in <u>Evans v. Chalmers</u>,[39] the Court shall dismiss Plaintiffs' Fourteenth Amendment claims.

In sum,  Plaintiffs' Fourth Amendment claims are not dismissed but Plaintiffs' Fourteenth Amendment claims are dismissed as effectively subsumed within their Fourth Amendment claims.

C. <u>Claims Asserted Against the State</u>

The State of Maryland has not waived its sovereign immunity

---

[38]   "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing' these claims." <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994)(quoting <u>Collins v. Harker Heights</u>, 503 U.S. 115, 125 (1992)).

[39]   703 F.3d at 646 n.2 ("Because the Fourth Amendment provides "an explicit textual source" for § 1983 malicious prosecution claims, the Fourteenth Amendment provides no alternative basis for those claims.").

for tortious acts or omissions by State personnel made with

malice or gross negligence. Md. Code Ann., Cts. & Jud. Proc.

Art. § 5-522(a)(4) (2013 Repl. Vol.).

Plaintiffs seek to recover from the State by virtue of the

alleged tortious acts by Mosby and Cogen.  However, as discussed

herein,  Plaintiffs' claims against Mosby and Cogen are viable

only if they can establish malice or gross negligence.  Thus,

even if Plaintiffs should establish their claims based on

actions by Mosby and Cogen, the State would be entitled to

sovereign immunity.

Accordingly, all claims against the State of Maryland shall

be dismissed.[40]


D.  Defendants' Immunity Defenses

1.  Absolute Prosecutorial Immunity (Mosby)

The Supreme Court recognizes that, in § 1983 cases, a state

prosecutor is entitled to absolute immunity in taking actions

pursuant to his/her functional role as an advocate for the

state.  See Buckley v. Fitzsimmons, 509 U.S. 259, 282-83 (1993).

In Gill v. Ripley, the Maryland Court of Appeals held,

> as a matter of Maryland common law, []
> prosecutors enjoy absolute immunity with
> respect to claims arising from their role in

---

[40]   The State's MTCA Notice Requirement defense to the
defamation and false light claims is, accordingly, moot.

> the judicial process - evaluating whether to
> commence a prosecution by criminal
> information, presenting evidence to a grand
> jury in the quest for an indictment, filing
> charges, and preparing and presenting the
> State's case in court.

724 A.2d 88, 96 (Md. 1999).

Mosby claims absolute immunity from suit for all actions

taken by her when functioning as a prosecutor.  However, Mosby,

as "the official seeking absolute immunity bears the burden of

showing that such immunity is justified for the function in

question." Burns v. Reed, 500 U.S. 478, 486 (1991).

To determine the extent of prosecutorial immunity in § 1983

cases, the Supreme Court has adopted a "functional approach,"

which applies absolute immunity only when a prosecutor is

performing an advocacy function, but not an administrative or

investigative function. See Burns, 500 U.S. at 486, 491.

Maryland courts have also adopted the functional approach

to absolute prosecutorial immunity.   Thus, in Maryland law,

when a prosecutor acts as an investigator, he/she is not

entitled to absolute immunity. See Simms v. Constantine, 688

A.2d 1, 5 (Md. App. 1997) (holding that a prosecutor who

investigated three policemen and "falsified evidence against

[the three officers] so as to cause the initiation of criminal

prosecutions against them" was not entitled to absolute

immunity).

The validity of Mosby's claim that she was functioning as a prosecutor is not "clearly reveal[ed]" on the face of the complaint. See Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013).  In fact, Plaintiffs have presented factual allegations plausibly refuting Mosby's claim that she was functioning as a prosecutor when taking the actions upon which their claims are based.

Mosby's prosecutorial immunity defense is asserted regarding Plaintiffs' claims that she:

- Provided erroneous legal advice to Cogen,
- Caused false statements in the Application for Statement of Charges,
- Presented false grand jury evidence,
- Made tortious statements at her press conference.

These shall be addressed in turn.


a.   False Advice to Cogen

Plaintiffs allege that Mosby knowingly provided Cogen with false advice that probable cause existed to arrest Plaintiffs.

In Burns v. Reed, 500 U.S. 478 (1991), the Supreme Court rejected the proposition that prosecutors are entitled to absolute immunity for legal advice provided to police prior to the prosecution of a case.  Prosecutors who give "legal advice to police about an unarrested suspect" are not entitled to

absolute immunity.[41] <u>Buckley</u>, 509 U.S. at 275 (referencing

<u>Burns</u>).  As stated by the <u>Burns</u> Court:

> Although the absence of absolute immunity
> for the act of giving legal advice may cause
> prosecutors to consider their advice more
> carefully, "[w]here an official could be
> expected to know that his conduct would
> violate statutory or constitutional rights,
> he <u>should</u> be made to hesitate." Indeed, it
> is incongruous to allow prosecutors to be
> absolutely immune from liability for giving
> advice to the police, but to allow police
> officers only qualified immunity for
> following the advice. Ironically, it would
> mean that the police, who do not ordinarily
> hold law degrees, would be required to know
> the clearly established law, but prosecutors
> would not.

500 U.S. at 495 (internal citations omitted)(quoting <u>Mitchell v.</u>

<u>Forsyth</u>, 472 U.S. 511, 524 (1985)).

And, stated by the Maryland Court of Special Appeals:

> In no sense can any investigative
> activity undertaken by [a prosecutor] or any
> legal advice given by them to the police
> commissioner, to the Mayor, or to anyone
> else be deemed to be a part of the judicial
> function of the State's Attorney's Office.

<u>Simms</u>, 688 A.2d at 15.

In the instant dismissal context, Mosby is not entitled to

absolute immunity for her allegedly knowingly providing false

advice to Cogen as to the existence of probable cause to arrest

Plaintiffs.

---

[41]   They may, however, be entitled to qualified immunity.

b.   Application for Statement of Charges

Plaintiffs allege that Mosby knowingly participated with Cogen in creating a false and misleading Application for Statement of Charges that led to Plaintiffs' arrests.

In Buckley, the Supreme Court held that the defendant prosecutor could be entitled to qualified (but not absolute) immunity when he fabricated evidence during the preliminary investigation of a crime. 509 U.S. at 261.[42]  The Court stated that "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, 'it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" Buckley, 509 U.S. at 273 (quoting Hampton v. Chicago, 484 F.2d 602, 608 (7th Cir. 1973), cert. denied, 415 U.S. 917 (1974)).

In Kalina v. Fletcher, 522 U.S. 118 (1997), the Supreme Court drew a sharp distinction between a prosecutor's absolutely immune acts of preparing and filing an unsworn information charging plaintiff with burglary and an unsworn motion for an arrest warrant and the prosecutor's non-immune act in signing an accompanying "Certification for Determination of Probable Cause."  The Court concluded that in signing the Certification,

---

[42]    Specifically, the prosecutor developed the false testimony of an expert witness to link the suspect to a boot print left at the crime scene. Id.

the prosecutor could be entitled to qualified [but not absolute] immunity because he was acting as a "complaining witness," not an advocate. Id. at 130.

In Springemen v. Williams, 122 F.3d 211 (4th Cir. 1997), an Assistant State's Attorney reviewed an application for a Statement of Charges and Summons prepared by a police officer, and advised that the facts were sufficient to warrant filing the application.  Charges were brought and then dropped.  After the charges were dropped, the subject of the prosecution sued, alleging that the prosecutor had violated his Fourth Amendment right.  He alleged that there had been no probable cause for filing the charge and that the prosecutor's advice was the proximate cause of the criminal summons, which unreasonably deprived him of his liberty.  The Springemen court held that the prosecutor was entitled to absolute immunity, stating:

> Our decision today is not a close one. While the Supreme Court has not extended absolute immunity to all legal advice by prosecutors, it has never hesitated to grant such immunity to prosecutors acting as Williams did here - in their core role as advocates for the state.

122 F.3d at 214.  The Springemen court clarified that Burns "held that advising police in the investigative phase of a criminal case" was not a judicial function, whereas professionally evaluating evidence assembled by police was. Id. at 213.

It may well be that the evidence, as distinct from Plaintiffs' allegations, will establish that Mosby, like the prosecutor in <u>Springmen</u> is entitled to absolute immunity for her actions <u>vis-à-vis</u> the Application.  Certainly, she did not sign it and did not act as a "complaining witness" like the prosecutor in <u>Kalina</u>.  However, Plaintiffs allege that Mosby did not merely evaluate evidence and select the particular facts to include in the Application based on the fruits of an independent police investigation as recognized as acts of advocacy in <u>Kalina</u>. 522 U.S. at 130.  Rather, Plaintiffs allege, Mosby acted as an investigator engaged in the gathering (and fabricating) of evidence.  Indeed, even Cogen states in a Reply to the pending motions that "the charges were not based on a consultation with prosecutors so much as prosecutors themselves actually selected the charges to be filed based on their own investigation." [ECF No. 43 at 7 in 16-1304].  And, Mosby herself stated in her press conference:  "I can tell you that from day one, we independently investigated, we're not just relying solely upon what we were given by the police department, period." ¶ 81 [ECF No. 31 at 16-2663].

Mosby is not entitled to dismissal of claims related to the Application by virtue of absolute immunity for her actions.

c.   Grand Jury Evidence

Plaintiffs allege that Mosby caused false and misleading evidence to be presented to the grand jury that indicted them. For example, she[43] required a grand jury witness to testify pursuant to a "script" that included false and misleading statements and not to answer pertinent questions. ¶ 92 [ECF No. 31 in 16-2663].

Prosecutors are entitled to absolute immunity for actions taken before a grand jury.  Presenting evidence to seek an indictment is the first step in bringing a case. See Imbler v. Pachtman, 424 U.S. 409, 426 (1976).  Hence, even if Mosby, in fact, engaged in the conduct alleged by Plaintiffs, she would be immune from a claim based thereon.

Thus, all claims against Mosby based upon the presentation of evidence to, or withholding evidence from, the grand jury are dismissed.[44]

d.  Press Conference Statements

On May 1, Mosby made statements at a press conference on which Plaintiffs base claims for defamation and invasion of

---

[43]    And/or a member of her Office.
[44]    This dismissal of claims does not constitute a ruling that Plaintiffs may not introduce evidence of Mosby's actions vis-à-vis the grand jury that would be relevant to claims as to which she does not have immunity.

privacy (false light).  She is not entitled to absolute immunity from these claims.

As stated in Buckley v. Fitzsimmons,

> Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the press conference, [the prosecutor] did not act in "his role as advocate for the State." The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, see National District Attorneys Assn., National Prosecution Standards 107, 110 (2d ed. 1991), and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and . . . qualified immunity [not absolute immunity] is the norm for them.

509 U.S. at 277-78 (internal citations omitted)(quoting Burns, 500 U.S. at 491).

Mosby is not entitled to dismissal of claims based upon her statements at the press conference by virtue of absolute immunity.


2.   Statutory Immunity

Section 5-522 of Maryland Tort Claims Act provides that:

> State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from

> liability in tort for a tortious act or
> omission that is within the scope of the
> public duties of the State personnel and is
> made <u>without malice or gross negligence</u>.

Md. Code Ann., Cts. & Jud. Proc. § 5-522(b)(2013 Repl. Vol.)

(emphasis added).

Mosby, a State's Attorney, and Cogen, a Major in the

Sheriff's Office of Baltimore City, are "state personnel" under

§ 12-101, and thus are protected by statutory immunity.  Md.

Code Ann., State Gov't § 12-101(a)(6), (8) (2014 Repl. Vol.).

However, the scope of statutory immunity does not extend to

tortious actions committed with malice or gross negligence.

Plaintiffs' claims are based upon allegations that Defendants

acted with malice and/or gross negligence.

"Malice" for statutory immunity purposes "requires a

showing that 'the official intentionally performed an act

without legal justification or excuse, but with an evil or

rancorous motive influenced by hate, the purpose being to

deliberately injure the plaintiff'" and  "may be inferred from

the surrounding circumstances." <u>Talley v. Farrell</u>, 156 F. Supp.

2d 534, 545 (D. Md. 2001)(internal citations omitted)(quoting

<u>Green v. Brooks</u>, 725 A.2d 596, 610 (Md. App. 1999)).  The

plaintiff "'must allege with some clarity and precision those

facts which make the act malicious.'" <u>Id.</u>

Gross negligence, in the context of statutory immunity, has been defined as:

> something more than simple negligence, and likely more akin to reckless conduct; gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."

Cooper v. Rodriguez, 118 A.3d 829, 845-46 (Md. 2015) (quoting Barbre v. Pope, 935 A.2d 699, 717 (Md. 2007)).

There is no allegation that Defendants' actions were motivated by hate, or an intent to injure Plaintiffs.  However, taking Plaintiffs' factual allegations as true, they have presented a plausible claim that Defendants acted with utter indifference to Plaintiffs' rights to be free from unreasonable seizure and deprivations of liberty, i.e., with gross negligence.  Hence, while the evidence may later refute Plaintiffs' contentions, Defendants are not entitled to dismissal of Plaintiffs' claims by virtue of statutory immunity.

### 3.  Qualified Immunity

Defendants assert entitlement to qualified immunity for Plaintiffs' constitutional claims.[45]

---

[45]  Defendants also contend that public official immunity,

> "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In practical effect, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." This allowance for reasonable mistakes is the product of "balanc[ing] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."
> The shield of qualified immunity is lost when a government official (1) violates a constitutional right and (2) that right was clearly established.

Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016)(internal

citations omitted).

As noted in Graham, the right that must be clearly

established in question "is not the general right to be free

from arrest without probable cause, but rather the right to be

free from arrest under the particular circumstances of the

case."  Id.

In the instant case, the allegedly established right can be

---

which is a type of common law qualified immunity, applies to Plaintiffs' state claims. However, public official immunity only applies when the official is alleged to have acted negligently, Smith v. Danielczyk, 928 A.2d 795, 813-14 (Md. 2007), whereas, here, the Officers must contend that Defendants acted deliberately, with malice, and/or with gross negligence in order to plead legally cognizable claims. Therefore, it is not necessary for the Court to consider public official immunity.

stated to be the right to be free from arrest without probable
cause caused by Defendants' submitting the Application
containing false statements and omitting material facts with at
least reckless disregard for the truth.  As stated by the United
States Court of Appeals for the Fourth Circuit in 2007:

> [T]the Supreme Court has long held that
> a police officer violates the Fourth
> Amendment if, in order to obtain a warrant,
> he deliberately or "with reckless disregard
> for the truth" makes material false
> statements or omits material facts. We and
> our sister circuits have frequently applied
> this mandate.

Miller v. Prince George's Cty., MD, 475 F.3d 621, 631 (4th Cir.
2007) (internal citations omitted).

Defendants contend that because a District Court
Commissioner and the grand jury determined there was probable
cause, that should conclusively establish the existence of
probable cause to arrest Plaintiffs.[46]

As to the commissioner, the Fourth Circuit expressly has
rejected such a contention. "A magistrate's issuance of the
warrant [for arrest] will not shield an officer when . . . the
underlying affidavit includes deliberate and reckless
misstatements and omissions, as here." Id. at 632.  If, as
alleged here, a judicial officer finds probable cause based upon

---

[46]   See Mosby's Motion to Dismiss [ECF No. 25-1 in 16-1304] at
27 and Cogen's Reply [ECF No. 43 in 16-1304] at 7.

false statements in an affidavit, qualified immunity shall not shield the affiant when the affidavit includes deliberate and reckless misstatements and omissions.  See id.

Even if there were merit to the contention that the grand jury indictment based upon evidence presented to the grand jury established probable cause for prosecution,  Plaintiffs were arrested based upon the Application.

Of course, the Court is not definitively deciding that Defendants are not entitled to qualified immunity with regard to probable cause to arrest Plaintiffs.  Rather, the Court is determining that the existence of this affirmative defense is not clear on the face of the complaint and a firm conclusion on the reasonableness of the probable cause determination requires greater factual development. Cf. Tobey v. Jones, 706 F.3d 379, 389 (4th Cir. 2013) (concluding "[w]hat is reasonable in this context, therefore, requires greater factual development and is better decided once discovery has been conducted"); Swagler v. Neighoff, 398 F. App'x 872, 878 (4th Cir. 2010)(holding that the district court acted within its discretion in denying qualified immunity in advance of discovery.)[47]

---

[47]   In its recent decision in Pegg v. Herrnberger, No. 15-1999 (4th Cir. Jan. 4, 2017), ___ F.3d ___ (4th Cir. 2017), the United States Court of Appeals for the Fourth Circuit recognized that "probable cause or its absence will be at least an evidentiary issue in practically all [§ 1983 wrongful arrest]

Accordingly, Defendants are not entitled to dismissal of Plaintiffs' constitutional claims by virtue of qualified immunity.

V.   <u>CONCLUSION</u>:

For the foregoing reasons:

A.   In <u>MJG-16-1288</u>:

1. Defendant Samuel Cogen's Motion To Dismiss [ECF No. 12] is GRANTED IN PART and DENIED IN PART.

2. Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 25] is GRANTED IN PART and DENIED IN PART.

B.   In <u>MJG-16-1304</u>:

1. Defendant Samuel Cogen's Motion To Dismiss [ECF No. 8] is GRANTED IN PART and DENIED IN PART.

2. Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 25] is GRANTED IN PART and DENIED IN PART.

C.   In <u>MJG-16-2663</u>:

1. Defendant Samuel Cogen's Motion To Dismiss [ECF No. 11] is GRANTED IN PART and DENIED IN PART.

2. Defendant Marilyn Mosby's Motion to Dismiss [ECF No. 22] is GRANTED IN PART and DENIED IN PART.

D.   In all three cases:

1.  The following claims are dismissed:

a. False arrest,

---

cases" but noted that there is a significant difference between the context of a motion to dismiss and a motion for summary judgment in which the sufficiency of the evidence (as distinct from allegations) can be tested. <u>See also</u> <u>Tobey v. Jones</u>, 706 F.3d 379, 392 (4th Cir. 2013).

      b. False imprisonment,

      c. Abuse of process,

      d. Conspiracy,[48]

      e. Section 1983 Fourteenth Amendment Violations,

      f. Section 1983 Fourth Amendment claims based on presentation to the grand jury (Mosby),[49]

      g. All claims against the State of Maryland.

2. The following claims remain pending:

      a. Malicious prosecution,

      b. Defamation,

      c. Invasion of privacy (false light),

      d. Section 1983 Fourth Amendment claims.[50]

E. The Court shall, promptly, conduct a conference regarding further proceedings in these cases.

SO ORDERED, this <u>Friday, January 06, 2017</u>.


                               <u>       /s/          </u>
                                Marvin J. Garbis
                      United States District Judge

---

[48]   Plaintiffs are not precluded from asserting – should there be adequate evidence to do so - that a Defendant should be held liable on a substantive claim as a co-conspirator.
[49]   However, this Order does not determine whether evidence regarding Mosby's presentations to the grand jury would be inadmissible in regard to other claims.
[50]   And the duplicative Maryland Declaration of Rights Article 26 claims.

APPENDIX A

Summary of "Facts" as Alleged by Plaintiffs

Plaintiffs allege a version of the facts that is by no
means undisputed by Defendants.   However the Court must, in the
instant dismissal context, assume the truth of Plaintiffs'
pleading allegations.   Therefore, this statement of Plaintiffs'
version of the facts, is not intended to, and does not, present
any determination as to whether Plaintiffs can present evidence
to establish the allegations asserted.

1.   Gray's Arrest (Nero, Miller, Rice)

On the morning of April 12, 2015, Baltimore City Police
Officers Edward Nero ("Nero")and Garrett Miller ("Miller") and
Lieutenant Brian Rice ("Rice") were on bicycle patrol on North
Avenue.   Rice called for help in pursuing two suspects.   Nero
and Miller responded. Officer Miller apprehended one of the
suspects, Freddie Carlos Gray, Jr. ("Gray") near Mount Street.

After detaining and handcuffing Gray "for officer safety
reasons," Miller found "a spring-assisted knife" on Gray's
person.   Compl., ¶¶ 19, 22 [ECF No. 33-1 in 16-1288].   This
knife was illegal under Article 19, Section 59-22 of the
Baltimore City Code, which states "[i]t shall be unlawful for
any person to sell, carry, or possess any knife with an

automatic spring or other device[51] for opening and/or closing the blade, commonly known as a switch-blade knife."  Miller arrested Gray for possession of the knife.

During his arrest, Gray "became physically and verbally combative," causing a crowd to form around the Officers and Gray.  ¶ 22 [ECF No. 33-1 in 16-1288].  A police wagon was summoned and arrived driven by Officer Caesar Goodson ("Goodson").  Gray refused to enter the police wagon for transport.  Therefore, Nero and another Officer carried Gray to the wagon.

Gray stood on the back step of the wagon as Nero conducted a second search for weapons and then was placed inside the wagon.  During this entire encounter, Nero, a former EMT, "did not observe Gray exhibiting symptoms of a medical emergency." Id. at ¶ 20.


2.   The Transport of Gray

Gray was transported from the scene of his arrest to the Western District police station, driven by Goodson.  Goodson made four stops en route.

---

[51]   That is, the Code prohibits possession of a knife with any automatic device (not just a spring) for opening or closing the blade.

a. <u>First Stop (Nero, Miller, and Rice)</u>

Once Gray was in the wagon, he "began banging and slamming himself" against the walls of the vehicle while screaming and yelling. <u>Id.</u> at ¶ 27.  In order to avoid the gathering crowds, Goodson moved the wagon one block away to complete paperwork and effectuate the arrest.  At this first stop, Miller and Rice removed Gray from the wagon, switched his handcuffs for flex cuffs, and placed leg shackles on Gray because he was "thrashing" around the wagon. ¶ 25 [ECF No. 39-2 in 16-1304].

Rice called for back-up because another crowd of onlookers was forming in response to Gray's yelling and banging.  Rice, Nero, and Miller had no further interactions with Gray.

b. <u>Second Stop</u>

Goodson made a second stop near Baker and Mount Streets, but none of the Plaintiffs interacted with Gray at this stop.

c. <u>Third Stop (Porter)</u>

Goodson stopped a third time at the intersection of Druid Hill Avenue and Dolphin Street.  Goodson requested an additional officer to respond to the area.  Officer William Porter ("Porter") responded and observed Gray lying prone on the floor of the vehicle.  Gray asked Porter for "help." ¶ 56 [ECF No. 31 in 16-2663].  Porter asked Gray, "what do you mean help?" and

Gray asked for help in getting off the floor.  Id.  Porter raised
Gray by his arms to a sitting position on the bench.  Porter
could not fit in the wagon compartment while Gray was inside.
Gray did not appear to need medical assistance, but Porter asked
him if he wanted medical help.  Gray replied that he did, and
Ported advised Goodson to take Gray to the hospital.  Porter
"observed no exigent medical need, and observed Gray to be able
to sit upright, breathe and communicate." Id. at ¶ 57.  Porter
knew that "many detainees are trying to avoid being transported
to the detention facility" by requesting medical assistance.  Id.

### d. Fourth Stop (Porter, White)

Goodson made a fourth stop at North Avenue to pick up a new
arrestee, Donta Allen, who was detained by Miller and Nero.
There was a call for back-up, to which Porter and Officer Alicia
White ("White") responded separately.

When Porter arrived, he observed Gray kneeling on the
vehicle floor and leaning against the bench.  Porter spoke to
Gray and confirmed that Gray still wanted to go to the hospital.
Porter told this to another officer at the scene.

When White arrived, she approached Gray in the wagon and
attempted to speak with him.  She saw him breathing and heard
him making noises, but Gray would not answer her, which White
concluded was a sign of his non-compliant behavior.  White

states that Gray did not appear to be in medical distress.  No one told her that a medic was needed.  Both White and Porter left to go to the Western District station.

### e. Arrival at Western District (White and Porter)

The police wagon arrived at the Western District Station with Gray inside.

When Porter reached the station and approached the wagon, he saw that Gray was unresponsive.  Porter tapped Gray, but Gray did not respond.  Another officer began emergency aid while Porter called a medic.

When White arrived at the station, she saw officers removing Gray from the wagon and was told, for the first time, to call a medic.  Another officer told White a medic had already been called, but White called to confirm it was en route.

### 3. Gray's Death

A medical unit took Gray from the Western District Station to the University of Maryland Shock Trauma Unit where he underwent surgery.  On April 19, 2015, Gray died from a spinal cord injury.

### 4.   The Investigation and Charges

Following Gray's death, State's Attorney Mosby ("Mosby")

led an independent investigation into the cause of Gray's death conducted by the State's Attorney's Office ("SAO") police integrity unit.  According to Mosby, the "findings of [the SAO's] comprehensive, thorough and independent investigation, coupled with the medical examiner's determination that Gray's death was a homicide, . . . led us to believe that we have probable cause to file criminal charges." Transcript at 1 [ECF No. 23-1 in 16-1304].

Plaintiffs allege that Mosby and Major Samuel Cogen of the Baltimore City Sheriff's Office ("Cogen") committed various improper actions that Mosby and Cogen deny.  According to Plaintiffs, Mosby and the SAO manipulated, fabricated, and falsified evidence so that Plaintiffs[52] would be arrested and indicted. ¶ 79 [ECF No. 31 in 16-2663].  Mosby, during her investigation, and "with Cogen's complicity and assistance," developed a false and misleading narrative to justify the Statement of Charges and arrest warrant Application ("Application"). Id. at ¶ 85.  This narrative made it seem that Gray had committed no crime, Plaintiffs illegally arrested Gray, purposely neglected to seatbelt him so that he would be injured, and then ignored his medical symptoms and cries for help.

Specifically, the Application stated that the knife Gray

---

[52]    And Goodson.

possessed was "lawful under Maryland law," and made no mention
that it was actually illegal under the Baltimore City Code.  The
narrative omitted exculpatory facts that would tend to show that
Gray was uncooperative, did not exhibit outward signs of medical
distress, and had tried to injure himself by banging his head on
the wagon wall, as well as other omissions.

Cogen signed and submitted the Statement of Charges and
Application for Statement of Charges to a District Court
Commissioner at Mosby's direct or indirect instruction.  Cogen
allegedly knew that the statements submitted to get the arrest
warrants were false and unsupported by any evidence because of
his participation in the investigation.

On May 1, 2015, Plaintiffs (and Goodson) were arrested and
on May 21, 2015, indicted for charges on which no one was
convicted.


   5.  Mosby's Press Conference

On May 1, 2015, Attorney Mosby held a televised press
conference regarding her decision to pursue criminal charges
against the Officers.  Plaintiffs alleged that during her
presentation, Mosby spoke in a "divisive and inciting manner." ¶
65 [ECF No. 33-1 in 16-1288].  Mosby quoted from the
Application, including the false statement that the knife
recovered from Gray was legal, and therefore, Rice, Nero, and

Miller lacked probable cause to arrest Gray.

Mosby made statements emphasizing her role in the SAO's independent investigation.  For example:

> Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension. Over the course of our independent investigation, in the untimely death of Mr. Gray, my team worked around the clock; 12 and 14 hour days to canvas and interview dozens of witnesses; view numerous hours of video footage; repeatedly reviewed and listened to hours of police video tape statements; surveyed the route; reviewed voluminous medical records; and we leveraged the information made available to us by the police department, the community, and the family of Mr. Gray.

Transcript at 1 [ECF No. 23-1 at 16-1304].

> We independently verified those facts and everything we received from the police department, so it's a culmination of the independent investigation that we conducted as well as the information we received from the police department.
>
> *     *     *
>
> I can tell you that from day one, we independently investigated, we're not just relying solely upon what we were given by the police department, period.

¶ 81 [ECF No. 31 in 16-2663].

Mosby also made other statements on which Plaintiffs base claims, such as

> To the people of Baltimore and demonstrators across America: I heard your cries for 'No

> justice, no peace.' Your peace is sincerely
> needed as I work to deliver justice on
> behalf of this young man. To those that are
> angry, hurt or have their own experiences of
> injustice at the hands of police officers I
> urge you to channel that energy peacefully
> as we prosecute this case.

Transcript at 4 [ECF No. 23-1 in 16-1304].

> Last, but certainly not least, to the youth
> of the city. I will seek justice on your
> behalf. This is a moment. This is your
> moment. Let's insure we have peaceful and
> productive rallies that will develop
> structural and systemic changes for
> generations to come.

Id. at 5.

Plaintiffs allege that Mosby made her press conference statements out of improper motives, such as pursuing political ambitions, influencing legislation, and quelling the riots that were taking place in Baltimore at the time.

6. Grand Jury Presentation

On or about May 21, 2015, the SAO presented evidence before a grand jury to get indictments against Plaintiffs.[53] Assistant State's Attorney Janice Bledsoe gave Baltimore City Police Detective Dawnyell Taylor, the lead detective in the criminal investigation of Gray's death, a four-page "script" to read in front of the grand jury. ¶ 92 [ECF No. 31 in 16-2663]. This

---

[53]    And Goodson.

script was "incomplete, misleading, biased, and partially false"; for example, it falsely stated that the arresting Officers tased Gray. Id. at ¶ 107.  Detective Taylor expressed concerns about the document because of its misleading and false information, but she was instructed to read it anyway, and was prevented from responding to jury questions.  The grand jury returned criminal indictments against all of the Officers.


    7. Prosecutions

The SAO obtained no convictions on any of the charges arising out of the Freddie Gray incident.  In December 2015, Porter's trial ended in a hung jury and mistrial.  Nero and Rice had bench trials and were acquitted on May 23, 2016, and July 18, 2016, respectively.  On July 27, 2016, Mosby entered a nolle prosequi in Officers Miller's, Porter's, and White's criminal cases.

APPENDIX B

The Franks Analysis

Plaintiffs present § 1983 malicious prosecution and/or unlawful seizure claims of violation of their Fourth Amendment rights. See Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2014).

"A plaintiff's allegations that police seized him 'pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a . . . claim alleging a seizure that was violative of the Fourth Amendment.'" Miller v. Prince George's Cty., MD, 475 F.3d 621, 627 (4th Cir. 2007)(quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183-84 (4th Cir. 1996)).  Specifically, the Officers allege that they were arrested pursuant to warrants that lacked sufficient probable cause because the Defendants deliberately included false statements and omitted exculpatory evidence from the Application.

To evaluate a "false affidavit" claim, as made by Plaintiffs, courts apply the two-prong test established in Franks v. Delaware, 438 U.S. 154 (1978).

> First, plaintiffs must allege that defendants "knowingly and intentionally or with a reckless disregard for the truth" either made false statements in their affidavits or omitted facts from those

> affidavits, thus rendering the affidavits
> misleading. Second, plaintiffs must
> demonstrate that those "false statements or
> omissions [are] material, that is, necessary
> to" a neutral and disinterested magistrate's
> authorization of the search.

Evans v. Chalmers, 703 F.3d 636, 649-50 (4th Cir. 2012)

(citations omitted)(quoting Franks, 48 U.S. at 155-56)).

Plaintiffs allege that the Application for Statement of

Charges ("the Application") contained material false and

misleading statements, including (1) the false statement that

Rice, Miller, and  Nero did not have probable cause to arrest

Gray because he had committed no crime; (2) the misleading

statement that the knife was "lawful under Maryland law"; (3)

the false statement that White was advised that Gray needed a

medic at the last stop; and (4) the false statement that Gray

was in a "seriously deteriorating medical condition" at or

before the last stop before the police station.

Plaintiffs also allege that Defendants caused material

omissions from the Application, including the facts that (1) the

knife found on Gray was assisted by a spring or other device for

opening and/or closing the blade and was illegal to possess in

Baltimore City; (2) a crowd was forming around the police wagon

at the first and second stops; (3) Gray was being physically

uncooperative and banging his head on the wall of the police

wagon; (4) the Baltimore Police Department General Order

regarding seatbelting arrestees had been issued on April 3, 2015, and did not impose a legal duty on the Officers; (5) two witnesses at later stops stated that Gray was not in obvious medical distress; (6) Gray's neck injury was not obvious to the medics who responded at the station; (7) Porter told the driver (Goodson) to take Gray to the hospital even though he "believed that Gray asked for a medic for purposes of being taken to the hospital to avoid being processed, rather than because that he was in need of medical assistance," ¶ 98 [ECF No. 31 in 16-2663]; and (8) White "instructed other officers to call for a medic, and then followed up again when the medic did not promptly arrive, as soon as she knew that Gray was in distress, as she clearly stated in her Recorded Statement." Id. at ¶ 100.

Viewed in the light most favorable to the Plaintiffs, they present allegations that present a plausible claim that the Defendants made false statements or omissions either knowingly or with reckless disregard of their truth or falsity.

An official acts with "reckless disregard" when he or she acts "'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts" or 'had obvious reasons to doubt the accuracy of the information he reported.'" Miller, 475 F.3d at 627 (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)). "With respect to omissions, 'reckless

disregard' can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause,'" but mere negligence or innocent mistake is not sufficient to show "reckless disregard." Id. (quoting Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003)).

Plaintiffs allege that Mosby and Cogen knew from their investigation that the alleged false statements in the Application were untrue, or stated them with no factual support, and intended to make the Application misleading in order to arrest the Officers and gain national attention, calm the riots in Baltimore City, and accomplish other personal objectives.

For example, Mosby knew that the knife Gray possessed was a spring or other device assisted knife because she saw the knife, she knew that the SAO was prosecuting other individuals for possession of similar knives, and she knew that a District Court Commissioner had found there had been probable cause to arrest Gray because of his possession of the knife.  Plaintiffs assert that Mosby intentionally misled the District Court Commissioner by misleadingly wording the Application to say that the knife was "lawful under Maryland law," without accurately describing or even mentioning the Baltimore City Code provision making its possession illegal.

Plaintiffs allege that Cogen participated directly or

60

indirectly in the investigation, presenting a plausible basis
for a reasonable inference that Cogen knew what the knife was
and that Gray had been charged with illegal possession of it.

Plaintiffs allege that there was no factual basis
whatsoever to support the statements in the Application that
Gray was obviously injured before arriving at the police
station.  In fact, Plaintiffs refute the statement, alleging
that witnesses said that Gray was conscious at the last stop,
banging his head on the wall, and the medics did not see that he
had a neck injury.

Furthermore, if the Mosby had – as she claimed - conducted
a thorough independent investigation, which Major Cogen either
participated in or reviewed the results of, the Defendants would
have known the alleged exculpatory facts existed, such as the
witness statements and Plaintiffs' attempts to check on Gray and
get him medical attention once they knew it was needed.
Plaintiffs allege that these facts were omitted intentionally by
Mosby, and with at least reckless disregard by Cogen.

In sum, Plaintiffs plausibly allege that the Application
was misleading because the omitted facts, when viewed in a light
most favorable to the Plaintiffs, establish the absence of
probable cause to arrest Plaintiffs.  These facts are: (1)
Plaintiffs did have probable cause to arrest Gray, (2) Gray was
trying to purposely injure himself to be avoid being taken to

jail, (3) Plaintiffs were not ignoring an obvious medical need on Gray's part, and (4) Plaintiffs did not seatbelt Gray out of a need to move the wagon away from the crowd and out of concern for officer safety because Gray was being physically combative. Plaintiffs further allege that they did get medical attention for Gray as soon as they were aware he actually needed medical help.

Plaintiffs have made adequate allegations to satisfy the first Franks prong.  That is, that Defendants knowingly and intentionally, or with a reckless disregard for the truth, either made false statements in their affidavits or omitted facts from those affidavits, thus rendering the affidavits misleading.

Under the second Franks prong, Plaintiffs must allege facts to present a plausible claim that the false statements and omissions were material.  "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.' If the 'corrected' warrant affidavit establishes probable cause, no civil liability lies against the officer." Miller, 475 F.3d at 628 (quoting Wilson, 212 F.3d at 789). "Probable cause exists when the facts and circumstances within an officer's knowledge — or of which he possesses reasonably trustworthy information —

are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." Wadkins v. Arnold, 214 F.3d 535, 539 (4th Cir. 2000)(citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).

As a result of the Application, the Officers were arrested and charged with manslaughter (White), involuntary manslaughter (Rice, White, Porter), intentional second degree assault (all Plaintiffs), negligent second degree assault (Rice, Nero, Miller), misconduct in office (all Plaintiffs), and false imprisonment (Nero, Miller, Rice).

The Court has read the Application for the Statement of Charges adding the alleged omissions and subtracting the alleged false statements to evaluate whether the corrected Application could "convince a person of reasonable caution" that Plaintiffs could have committed at least one of the offenses charged. Wadkins, 214 F.3d at 539.

The assault and false imprisonment charges rested on the alleged erroneous assumption that Gray was arrested without probable cause.  When the false and misleading statements about the knife are corrected according to Plaintiffs' contentions, it is obvious that there was probable cause to arrest Gray.

The corrected Application presents no probable cause for the voluntary manslaughter charge against Officer White. Voluntary manslaughter is "an intentional homicide, done in a

sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." <u>Cox v. State</u>, 534 A.2d 1333, 1335 (Md. 988).  Viewed in the light most favorable to White, the Application presents no basis to conclude that White, not knowing that Gray was injured or needed a medic until he was at the station, intended to kill him.

The crime of involuntary manslaughter, for which Rice, White, and Porter were charged, "is predicated on negligently doing some act lawful in itself, or by negligently failing to perform a legal duty" and "the negligence necessary to support a conviction must be gross or criminal, viz., such as manifests a wanton or reckless disregard of human life." <u>State v. Gibson</u>, 242 A.2d 575, 579 (Md. App. 1968), <u>aff'd</u>, 254 A.2d 691 (Md. 1969)(citing <u>State of Maryland v. Chapman</u>, 101 F.Supp. 335 (D. Md. 1951)).  The Application assertion central to the involuntary manslaughter charges, as well as the misconduct in office charges, is that Plaintiffs failed to seat belt Gray as required by the Baltimore Police Department General Order with a wanton or reckless disregard for human life.  Based on the "corrected" Application, viewed in a light most favorable to the Plaintiffs, no reasonable person could conclude that Plaintiffs failed to seat belt Gray due to gross or criminal negligence under the circumstances.  Rather, as Plaintiffs allege, the

Order was new, they needed to quickly move the wagon to avoid growing crowds, Gray was physically uncooperative making it hard to position him in the wagon, and they did not know Gray was hurt.

In the instant dismissal context, Plaintiffs have alleged facts adequate to present a plausible Fourth Amendment claim.